**LORAIN NAACP, et al., Plaintiffs,**

v.

**LORAIN BOARD OF EDUCATION, Defendant–Appellee, Cross–Appellant,**

**Ohio Department of Education, Defendant–Appellant, Cross–Appellee,**

**Coalition for Hispanic Issues and Progress, Intervenor–Appellee,**

**Leo Svete, Defendant.**

**Nos. 91–3666, 91–3667.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1992.

Decided Nov. 12, 1992.

Rehearing and Rehearing En Banc Denied Jan. 5, 1993.

Thomas I. Atkins, Brooklyn, N.Y., for plaintiff Lorain NAACP, et al.

Anthony B. Giardini (argued and briefed), Lorain, Ohio, for defendant-appellee, cross-appellant Lorain Bd. of Educ.

Rita S. Eppler (argued and briefed), Samuel N. Lillard, Office of Atty. Gen., Lauren M. Ross, Columbus, Ohio, for defendant-appellant, cross-appellee Ohio Dept. of Educ.

Jose C. Feliciano, Sr., Loretta H. Garrison (argued and briefed), Baker & Hostetler, Cleveland, Ohio, for intervenor-appellee Coalition for Hispanic Issues and Progress.

Before: RYAN and SUHRHEINRICH, Circuit Judges, and CHURCHILL, Senior District Judge.[*]

RYAN, Circuit Judge.

This case is an appeal from a judgment modifying a 1984 school integration consent decree. The modification, among other things, substantially increased the financial obligations of the Ohio Department of Education, a voluntary participant in the original school desegregation plan. In a Memorandum Opinion and Judgment, entered June 21, 1991, the United States District Court for the Northern District of Ohio eliminated an express $1 million limitation on the liability of the State of Ohio Department of Education contained in the desegregation consent decree and ordered the State to contribute an estimated $9 million to its co-defendant, the Lorain Board of Education, to assist in the voluntary desegregation of the Lorain public school system. *See Lorain NAACP v. Lorain Bd. of Educ.*, 768 F.Supp. 1224 (N.D.Ohio 1991). We are asked to decide whether the district court acted within its discretion in increasing the State's financial obligations under the decree beyond the scope of its consent and in the absence of an adjudication or admission of wrongdoing. We think the court exceeded its authority in modifying the consent decree as it did, and we shall, therefore, reverse.

I.

In 1979, the Lorain, Ohio branch of the National Association for the Advancement of Colored People and a number of black and Hispanic students and parents of stu-

---

[*] The Honorable James P. Churchill, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

dents in the public schools in the Lorain City School District instituted this desegregation action. In their complaint, plaintiffs alleged that defendants—Lorain Board of Education and its individual members, the Ohio State Board of Education and its individual members, and the state and local public school superintendents—"ha[d] effected racial segregation and discrimination in the operation of the Lorain public schools" by the closing of certain school facilities, the assignment of students, and the hiring and assignment of teachers and administrators.

Prior to an adjudication on the merits of plaintiffs' complaint, the parties settled all claims. In a consent decree entered into by the parties and approved by the district court in 1984, the parties "waived the need [for the district court] to make findings of fact and conclusions of law on all issues raised in the complaint, except the issue regarding plaintiffs' right to and the amount of attorney fees incurred in prosecution of this action." Certain affirmative duties were assigned to defendants by the terms of the decree, but all parties agreed that "nothing in this Consent Decree shall be construed as an admission by any of the defendants of any violation of any provision of the Constitutions of the United States or the State of Ohio."

Under the terms of the consent decree, responsibility for designing and implementing a desegregation plan fell upon the Lorain Board of Education. Its first duty was to "immediately . . . begin to develop a plan by which the objectives outlined in the Goal Statement will be achieved. . . ." These objectives included eliminating racially identifiable schools and establishing in each school a composite minority student ratio of no more than a plus 20% or minus 15% deviation from the average racial composition in the school district; retaining an independent contractor to evaluate Lorain's bilingual programs, eliminating shortcomings discovered in the evaluation process, and adequately maintaining bilingual programs for Hispanic students in compliance with state and federal law; providing for student transfers from their assigned school to other schools unless the transfer

adversely affected racial composition in the schools and equitably allocating the burdens of school assignments and closings between non-white and white students and between various neighborhoods; and establishing minority employment in the district at levels equal to the racial composition of the adult population of Lorain by increasing minority hirings of both certified and uncertified personnel.

The State of Ohio's only obligations under the consent decree consisted of specified financial contributions to Lorain. The consent decree states:

The State of Ohio will pay to the Lorain City School District 50 percent of the expenses incurred by the Lorain City School District in designing, implementing, administering and maintaining educationally sound programs reasonably expected to reduce racial isolation to the standards defined in the Goal Statement. The State of Ohio will pay 50 percent of the unreimbursed expenses attributed to the transportation of students who are being transported for the reduction of racial isolation. "Unreimbursed expenses" shall mean the portion of this expense which remains after deducting the state transportation reimbursement applicable to students involved in such transportation.

The total of the expenses referred to above shall be limited to those incurred during the seven school years 1984–85 through 1990–91, and the State of Ohio payments shall not exceed $1 million during the seven year term, or 50 percent of the actual reduction of racial isolation costs, whichever is less.

Beginning in December 1984, payments made by the State shall be made semi-annually in the months of December and June upon submission of vouchers covering costs actually incurred by the Lorain City School District. Such payments shall be in addition to all other state and federal funds to which the Lorain City School District may be entitled under law and regulations existing at the time of the submission of the vouchers. . . . .

The parties agree that the Lorain City School District shall retain an independent contractor to evaluate the bilingual programs currently in effect to determine program effectiveness. The cost of such evaluation shall be considered part of the cost of implementation of the Consent Decree and up to 50 percent of the cost shall be reimbursed by the State of Ohio....

Initially, the parties were unable to reach an agreement on a single plan to achieve the objectives of the consent decree, particularly the means by which to achieve school building and classroom racial composition goals. The Board proposed a magnet school program involving the voluntary transfer of students within the district, while plaintiffs preferred a system of involuntary student reassignments. The district court held hearings on this dispute and other matters of concern in March 1985. Eventually, the district court approved the implementation of the magnet program proposed by the Board, beginning in the 1985–86 school year, but conditioned continuation of the program on achievement of the targeted racial composition ratios established by the decree. The district court also approved the Board's proposals to evaluate Lorain's bilingual program and established monitoring procedures for the attainment of minority hiring goals.

### A.

A brief description of the scope and cost of the principal features of the desegregation plan may be helpful to an understanding of the context in which the district court was asked to modify the consent decree.

At the time the parties entered into the consent decree, six schools were out of compliance with the racial composition goals established by the parties, and the parties estimated that approximately 650 students would have to be moved to meet the goals of the decree. It was later determined that it was necessary to move 1200 students in order to reach and maintain desegregation goals. By 1990, seventeen of Lorain's twenty-one schools, and approx-imately 3500 of its 12,300 students, were involved in the magnet program, even though the district court found that only 1300–1350 were necessary to meet the goals established in the consent decree. Lorain has employed over 100 additional teachers, administrators, and clerical staff, including a desegregation specialist, to implement and maintain its magnet school program even though the student population remained relatively constant at 12,000. Student racial balance within the goals established by the consent decree has been successfully achieved and maintained in Lorain under the magnet school program.

Although some bilingual education was already available at the time of the decree, the decree-required independent evaluation of these programs led to Lorain's development of a core bilingual program to meet the needs of English language deficient students. Four school buildings in Lorain are used to house different aspects of the bilingual program, each focusing on students with varying levels of English-language skills. In the 1986–87 school year, Lorain reopened the Palm Academy building for instruction of younger students lacking any English-speaking skills and for those needing primary instruction in Spanish while acquiring fluency in English. Because the curriculum at the Palm Academy was focused on bilingual education and thus drew a high concentration of Hispanic students, the Board, recognizing that the building would be out of compliance with the racial composition percentage requirements established by the consent decree, also established a magnet Montessori school in the Palm Academy, drawing white, black, and Hispanic children. In 1990, the district court exempted the bilingual program at the Palm Academy from the racial composition mandates of the consent decree, but ordered that the Montessori program remain in compliance with the decree's racial balancing requirements. Since the implementation of a comprehensive core bilingual program in Lorain, test scores have improved and the district has been able to mainstream and retain larger numbers of Spanish-speaking students.

Lorain has had some difficulties, however, in attaining the hiring and employment goals established by the consent decree. While approximately 12% of the adult population in Lorain is black and 14% Hispanic, the school district has been unable to achieve these racial and ethnic composition levels in its professional employee ranks. Lorain has made continuous efforts to meet the hiring requirements set forth in the consent decree, including increasing teacher salaries, directing advertisements and vacancy notices toward recruiting minorities, participating in the Ohio Minority Recruitment Consortium, establishing contacts with minority organizations to aid in the recruitment and retention of minority applicants, having personnel staff members travel to colleges in and beyond Ohio to recruit and interview prospective minority teachers, and paying the transportation costs of minority applicants willing to travel to Lorain for interviews. Lorain's location and inability to offer salaries competitive with other school districts, however, have hindered its minority hiring efforts.

Lorain has also sought to meet hiring goals established in the consent decree by opening up teaching and administrative positions through an early retirement incentive (ERI) program. The ERI plan has proved costly in the short term, with Lorain exposing itself to over $9 million in potential liability. As a result, Lorain was forced to negotiate a new contract with its teachers and administrators to establish a cut-off date for participation in the ERI program. In return for this concession, Lorain promised 5% pay raises in each of five years beginning in August 1991, in addition to the 10% increase effective January 1990 and another 6.5% increase effective August 1990. In the end, the twenty-four teachers and two administrators who took advantage of early retirement cost Lorain over $2.9 million in fiscal year 1991. As the result of salary increases, Lorain's average teacher's salary increased to over $34,000 in 1991, up from about $29,000 the previous year. Lorain expends 97.5% of its total revenue on salaries and fringe benefits, while most school district spend about 85% on these expenses.

Accomplishing and maintaining compliance with the requirements established by the consent decree, and meeting other budgetary demands, have, of course, cost money, and this is where the present dispute between Lorain and the State of Ohio has arisen. By the third year of implementation of the desegregation plan, the State had already paid the entire $1 million that was its obligation under the consent decree. Lorain relied on $3.4 million in federal grants to offset the costs of the desegregation plan, but its grant request for the 1991 fiscal year was rejected. Facing shortfalls, Lorain eliminated some academic and extracurricular programs and reduced certain support and transportation services.

### B.

In January 1990, the Board filed a motion to increase the State of Ohio's contributions to Lorain's desegregation plan. The Board argued that without additional financial contributions from the State, desegregation goals would be jeopardized and the purposes of the consent decree thwarted. Initially, the district court denied Lorain's motion to increase the State's share of the costs of desegregation, holding that "[t]he language of the Consent Decree clearly limits the State's financial exposure to the cost of the desegregation plan ... to $1 million dollars or 50 percent of the actual cost, whichever is less" and finding "no provision in the consent decree for increased contribution on the part of the State should the cost of the desegregation plan exceed the original estimate."

Lorain then filed a motion for reconsideration. Following a hearing, the district court indicated that it was inclined to modify the decree and ordered the State of Ohio to renegotiate the terms of its financial arrangement with Lorain. The parties were unable, however, to agree to any revisions to the consent decree with respect to state funding. The district court, after additional hearings, modified the terms of the decree by eliminating the $1 million ceiling on the State's financial liability to Lorain. The district court noted that the State of

Ohio "clearly agreed to make a financial contribution to the Lorain desegregation plan" and then went on to explain:

> Granted, the Consent Decree provides for a $1 million cap on the State's contribution. However, the Court has made extensive fact findings which support the Court's conclusion that modification is warranted in the present case with respect to the amount of the State's contribution. This is not a case ... where the Court is attempting to argue that the language of the Consent Decree provides for State Funding beyond the $1 million cap. The Court acknowledges that the Consent Decree as it now stands does not provide for additional state funding. However, the Court finds, for the reasons set forth with specificity below, that a modification is warranted under the standard set forth by the Sixth Circuit....

The district court reasoned that time had made apparent that Lorain school officials, who lacked knowledge and experience in desegregation matters, had not negotiated an equitable arrangement in agreeing that the State's liability would be limited to $1 million, and in utilizing cost calculations based upon a faulty and unrealistic comparison to desegregation measures taken in Cincinnati. The district court found that the State and Lorain originally fixed the State's obligations by comparing the measures to be taken in Lorain with the desegregation program previously instituted in Cincinnati, where the State, after arduous negotiations, agreed to contribute $35 million to the school district's desegregation program. In Cincinnati, approximately 17,-000 students were involved in a magnet school program. In Lorain, the parties estimated that 500 to 650 would have to be involved to achieve the racial composition requirements. Thus, $1 million was proposed as a cap upon the State's liability, based on an approximate 35 to 1 ratio of students to be moved in Cincinnati and in Lorain.

The district court concluded that the liability cap had to be modified given that time and experience had shown that the parties had grossly underestimated the costs of desegregation and that the comparison between the State's involvement in Lorain and in Cincinnati was flawed. The district court also noted that the State had been ordered to pay 50% of desegregation costs in Cleveland, Columbus, and Dayton, and drew comparisons between the State's contributions in those cities and the relatively meager state funding received by Lorain.

The district court ordered the State to pay 50% of Lorain's desegregation costs for the 1989–90 school year, in the amount of $2,600,917, and a descending percentage of desegregation costs over the next four years, ranging from 40% for the 1990–91 school year to 10% for 1993–94. The district court held that at that point the State of Ohio's obligations to the Lorain desegregation plan would cease under the modified decree. The district court estimated that the State of Ohio's payments under the modified decree will amount to approximately $9 million. The State was also assessed interest on its contributions to Lorain and ordered to pay attorneys' fees incurred by the Board and CHIP in seeking an increase in state funding.

The State of Ohio has appealed and the Lorain Board of Education has cross-appealed.

## II.

■ The Lorain school desegregation consent decree is injunctive in nature, and appellate jurisdiction over the district court's modification of the decree therefore attaches under 28 U.S.C. § 1292(a)(1).[1] *See Bradley v. Milliken*, 772 F.2d 266, 270–71 (6th Cir.1985). We review a district court's modification of a consent decree under an

---

1. In pertinent part, section 1292 provides:
 (a) [T]he courts of appeals shall have jurisdiction of appeals from:
 (1) Interlocutory orders of the district courts of the United States ... granting, con-
 
 tinuing, modifying, refusing or dissolving injunctions....
 28 U.S.C. § 1292.

abuse of discretion standard. *United States v. Michigan*, 940 F.2d 143, 159 (6th Cir.1991). " 'A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.' " *Black Law Enforcement Officers Ass'n v. City of Akron*, 824 F.2d 475, 479 (6th Cir.1987) (quoting *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir.), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985)).

## III.

The district court addressed much of its attention, as the parties to this appeal did, to the issue of the proper standards to be applied in deciding Lorain's request for a modification of the consent decree to increase the State's financial liability. The State of Ohio argues that a strict standard is to be applied, while Lorain and CHIP contend that the district court correctly applied a relaxed modification standard. We shall address this issue as part of a general discussion of the nature and treatment of consent decrees, and the role of the courts in interpreting, enforcing, and modifying their terms.

■ The consent decree is "a strange hybrid in the law." *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir.1981). It is at once "a voluntary settlement agreement which could be fully effective without judicial intervention" and "a final judicial order ... plac[ing] the power and prestige of the court behind the compromise struck by the parties." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983). Thus, a consent decree is aptly described as "a settlement agreement subject to continued judicial policing." *Id.*

■ Since consent decrees and orders share many of the attributes of ordinary contracts, "they should be construed basically as contracts, without reference to the [claims the plaintiffs] originally sought to enforce but never proved applicable through litigation." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975). Furthermore, the Supreme Court has stated that " 'the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other....' " *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)). For these reasons, "the 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.' " *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984) (quoting *Armour*, 402 U.S. at 681–82, 91 S.Ct. at 1757).

■ Although interpretation of a consent decree is to follow the general rules prescribed in contract law, the courts, in effectuating the purposes or accomplishing the goals of a decree, are not bound under all circumstances by the terms contained within the four corners of the parties' agreement. Because of their dual character, consent decrees may be "treated as contracts for some purposes but not for others," *ITT Continental Baking*, 420 U.S. at 236 n. 10, 95 S.Ct. at 934 n. 10, and modification may be justified when a court is "satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *United States v. Swift & Co.*, 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). In *Swift*, the Supreme Court stated that "[n]othing less than a clear showing of grievous wrong" would support the modification of a consent decree. *Id.* at 119, 52 S.Ct. at 464. The Court, however, recently abandoned the rigid *Swift* standard and declared a lesser showing sufficient for modification of consent decrees entered in settlement of so-called "institutional reform" litigation involving and affecting the operation of governmental institutions or organizations. *See Rufo v. Inmates of*

*Suffolk County Jail,* —— U.S. ——, —— – ——, 112 S.Ct. 748, 758–60, 116 L.Ed.2d 867 (1992); *accord Heath v. DeCourcy,* 888 F.2d 1105, 1108–09 (6th Cir.1989).

A less stringent modification standard in these cases is justified for a variety of reasons. First, institutional consent decrees are "fundamentally different" from consent decrees between private parties because the former "affect more than the rights of the immediate litigants." *Heath,* 888 F.2d at 1109. Next, broader judicial discretion to modify the parties' agreement "is required so that the agreed upon solution to the problem giving rise to the litigation may be fine-tuned to accomplish its goal." *Id.* "The experience of the district and circuit courts in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation." *Rufo,* —— U.S. at ——, 112 S.Ct. at 758. The courts' ability to more easily modify consent decrees in institutional reform cases is important because "such decrees often remain in place for extended periods of time, [and therefore] the likelihood of significant changes occurring during the life of the decree is increased." *Id.*

 While we note that *Rufo* and *Heath* involved prison reform, we have found no indication, nor is there any reason to believe, that this type of case has somehow been set apart from other institutional reform litigation. Indeed, in *Rufo,* the Supreme Court cited an earlier school desegregation case, *Board of Education v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), as supporting the rejection of the *Swift* "grievous wrong" standard and suggested generally that desegregation cases, beginning with *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), serve as a paradigm for other types of institutional reform litigation. —— U.S. at ——, 112 S.Ct. at 758; *see also Appeal of Little Rock School Dist.,* 949 F.2d 253 (8th Cir.1991). Thus, although this circuit has never specifically

applied the less stringent standards to a consent decree entered in settlement of school desegregation litigation, we hold now that these decrees are subject to the same standards as enunciated in *Rufo* and *Heath.*[2]

 Under the relaxed standard, modification of an institutional consent decree

> may be warranted when changed factual conditions make compliance with the decree substantially more onerous ... when a decree proves to be unworkable because of unforeseen obstacles ... or when enforcement of the decree without modification would be detrimental to the public interest....

*Rufo,* —— U.S. at ——, 112 S.Ct. at 760. This circuit has announced a similar test to be applied in modifying institutional reform consent decrees:

> [T]he court need only identify a defect or deficiency in its original decree which impedes achieving its goal, either because experience has proven it less effective, disadvantageous, or because circumstances and conditions have changed which warrant fine-tuning the decree.

*Heath,* 888 F.2d at 1110. These standards, among other things, require the court "to balance the interest in preserving consent decrees entered into by agreement between private parties against the public interests sought to be achieved through modification of the decree." *Id.* The modification of an institutional consent decree will be upheld "if it furthers the original purpose of the decree in a more efficient way, without upsetting the basic agreement between the parties." *Id.*

With these basic principles of consent decree interpretation and modification in mind, we turn now to consideration of the specific issues presented by the district court's modification order.

### IV.

 We address, initially, a challenge to the district court's jurisdiction.

---

**2.** We also note that the standard for modifying a consent decree is the same whether entered through the consent of the parties or after full

and final adjudication of the merits at trial. *See Heath,* 888 F.2d at 1107 n. 1 (citing *Swift,* 286 U.S. at 114, 52 S.Ct. at 462).

The State of Ohio argues that "[t]he District Court lacked jurisdiction to expand the Consent Decree settling the LCSD desegregation case because there was never a finding of a constitutional violation on the part of [the State Department of Education]." We disagree. The consent decree states that it "shall remain in effect until the goals which are a part of the Decree have been achieved," and the State expressly agreed to "remain [a] part[y] to this action for purposes of enforcing this Decree and the plan adopted pursuant thereto." Moreover, a federal district court retains jurisdiction to modify a decree to adapt its terms to changed conditions, even where the decree was not litigated but instead entered by consent of the parties. *System Fed'n No. 91, Ry. Employees' Dep't v. Wright*, 364 U.S. 642, 650–51, 81 S.Ct. 368, 372–73, 5 L.Ed.2d 349 (1961). We hold that the district court had jurisdiction over the parties and over Lorain's motion for an increase in the State's contributions to desegregation efforts.

■ The State's appeal in this case does not challenge the district court's authority to modify a consent decree generally nor question the proper standard for modification; it is concerned instead with the court's authority to modify the decree by substantially increasing the State's burden, over its objection and without any finding or acknowledgment that the State has violated the plaintiffs' constitutional rights. The consent decree is clear and unambiguous with respect to the State of Ohio's financial liability to Lorain. It states: "[T]he State of Ohio payments shall not exceed $1 million ... or 50 percent of the actual reduction of racial isolation costs, whichever is less." This, of course, is an agreement by the State to pay $1 million, and no more. The parties to the decree also "waived the need [for the district court] to make findings of fact and conclusions of law on all issues raised in the complaint" and agreed that "nothing in this Consent Decree shall be construed as an admission by any of the defendants of any violation of any provision of the Constitutions of the United States or the State of Ohio." The consent decree thus limits the obligations of the State to a sum certain and specifically provides that there is no adjudication or admission of constitutional violation by the State. In addition, there has been no judicial determination of the merits of plaintiffs' claims and no finding of constitutional violation by any of the defendants, including the State, at any stage of the litigation.

■ In fashioning and effectuating school desegregation decrees, federal courts are guided by equitable principles, and, traditionally, "equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (footnote omitted). It is well established, however, that in desegregation cases, as in all constitutional matters, the federal judicial power "may be exercised 'only on the basis of a constitutional violation....'" *Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)). As the Court stated in *Rufo*, —— U.S. at ——, 112 S.Ct. at 762, "Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated." In *United States v. Atlantic Ref. Co.*, 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959), the Court observed that while a proposed interpretation of a consent decree might better effectuate the basic purposes of the statutes the government sought to enforce, "it does not warrant our substantially changing the terms of a decree to which the parties consented without any adjudication of the issues."

*United States v. Michigan*, 940 F.2d 143 (6th Cir.1991), a prison reform case brought by the federal government under the provisions of the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997–1997j, addresses an issue similar to that presented here. In its complaint, the United States alleged, *inter alia*, that the State of Michigan had perpetuated conditions and

practices constituting cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments of the United States Constitution, at three of its state prison facilities. A consent decree was entered in settlement of the litigation. Integral to the correction of the alleged constitutional violations at the prisons was the implementation of a plan for screening and classifying inmates. To this end, the State of Michigan agreed in the decree to design and implement certain classification measures to guide the proper assignment of inmates. *Id.* at 148. Among the numerous subsequent modification orders issued by the district court and reviewed in a consolidated appeal by this court was one involving the district court's "exten[sion of] the classification plan to prison facilities statewide, in derogation of the consent decree, which, by agreement of the parties, limited the application of the classification plan to the named institutions." *Id.* at 159. We reversed that portion of the district court's order, explaining:

> Conditions have not changed to such an extent that the trial court could look outside the four corners of the consent degree [sic] in determining the obligations of the parties. In addition, the record reveals no affirmative factual proof of constitutional violations to support this material extension and modification of the consent decree. Under the circumstances of this case, it is for Michigan to decide the feasibility of extending the professionally-based classification plan beyond the prisons named in the consent decree to prison facilities statewide.

*Id.*

In this case, too, we have been presented with a material extension of a defendant's duties and the question of the court's authority, in the absence of any finding of violation of plaintiffs' rights, to force these additional obligations on a defendant that

has accepted limited liability through entry of a consent decree. By agreeing to the terms of the decree, the State of Ohio gave up "the possibility of prevailing on the merits in exchange for granting *certain limited affirmative relief* to plaintiffs," and, in return, plaintiffs "exchanged their right to obtain adjudicatory relief which would fully eliminate the effects of discrimination in the past as well as in the future." *Williams v. Vukovich*, 720 F.2d at 920 (emphasis added). We acknowledge that a party may possibly enter into a consent decree in order to save itself from a harsher result following litigation, yet at this stage of the litigation, we "ha[ve] no occasion to resolve the merits of the disputed issues or the factual underpinnings of the various legal theories advanced by the parties." *Id.*

In *Fox v. Department of Housing & Urban Dev.*, 680 F.2d 315 (3d Cir.1982), the court stated:

> Although we do not doubt the power of a court to modify an injunctive order entered by consent, we think that in the usual case a court may not impose additional duties upon a defendant party to a consent decree without an adjudication or admission that the defendant violated the plaintiffs' legal rights reflected in the consent decree and that modification is essential to remedy the violation.... To impose additional duties under the decree ... is to disregard the basic rights of litigants who waive their right to litigate defenses by consenting to have a decree entered against them. The conditions upon which rights are waived must be respected.

*Id.* at 323;[3] *see also Walker v. Department of Housing & Urban Dev.*, 912 F.2d 819 (5th Cir.1990).

Lorain and the intervenor CHIP have offered several arguments to justify the district court's extension of the scope of the State of Ohio's financial liability.

---

**3.** In *Fox*, plaintiffs did not allege constitutional claims, but we see no reason to distinguish this case on the basis of the nature of plaintiffs' claims. In *United States v. Michigan*, 940 F.2d at 146, this court was confronted with allegations of Eighth and Fourteenth Amendment violations, yet our analysis of the court's authority to order extensions of the consent decree to reach the operation of facilities not contained in the decree did not vary on the basis of the allegations lodged against the defendant.

CHIP argues that "[b]y agreeing to the consent decree in 1984, the State certainly conceded the existence of a pre–1984 constitutional violation." The argument implies that by agreeing to contribute up to $1 million to implementation of the Lorain desegregation plan, the State implicitly accepted responsibility for a constitutional violation. We disagree. The agreement of the parties plainly stated that "nothing in this Consent Decree shall be construed as an admission by any of the defendants of any violation of any provision of the Constitutions of the United States or the State of Ohio."

Lorain argues that the State of Ohio's liability for 50% of the costs of desegregation in Cleveland, Dayton, and Columbus based on an adjudication of the merits of the plaintiffs' claims, and its assumption of a $35 million obligation in Cincinnati without an adjudication of fault, are implicit acknowledgements of liability for a greater proportion of the costs of the Lorain integration program. We disagree. Here, unlike the Cleveland, Columbus, or Dayton cases, there has been no finding that the State has committed a constitutional violation, and unlike with Cincinnati, the State here agreed to pay only $1 million. While the Cincinnati case may be instructive as to the genesis of this liability cap, it does not in any way justify the judicial modification of the State's express and unambiguous promise to pay up to $1 million, and no more, toward implementation of the Lorain desegregation plan.

■ We also find it necessary to address the district court's statement, based on testimony at the modification hearing, that "Dr. [G. Robert] Bowers [a former State Department of Education official] felt that if the case went to trial the defendants would be found liable for discrimination." This declaration appears as close as the district court comes to an adjudication of a constitutional violation, yet, as a "finding of fact" it not only runs counter to the express provisions of the consent decree, but appears to improperly delve into the State's motivation for compromise and misstates the record. Dr. Bowers stated that,

although the Lorain Board of Education likely had no defense to the allegations, he "was not of the opinion that the State should be in a defens[ive] posture in the Lorain case," unlike Cleveland, Dayton, and Columbus. The adjudications of constitutional violations by the State in Cleveland, Dayton, and Columbus cases are not only irrelevant to this case, but, according to Bowers, the State's role in those cities is also factually distinguishable from the Lorain case. The ultimate persuasiveness or veracity of Bowers' assertion is not important to this appeal, and we have no reason to express an opinion on either matter. We do note, however, that the State of Ohio has not, even in the evidentiary hearings on the issue of modification, admitted to any wrongdoing in Lorain.

Next, we reject the argument that the district court's failure to impose additional obligations on the State of Ohio would have effectively increased the burdens of the plaintiffs by jeopardizing the effective implementation of desegregation measures in Lorain. As the court stated in *Fox*, "[i]t is important to emphasize that the question for decision in this case is whether the consent decree should have been modified to impose a duty on the defendant that was not contained in it, and not ... whether the defendant should be released from the obligations imposed by the decree." *Fox*, 680 F.2d at 322–23. In support of its arguments for reversal of the modification order, the State of Ohio cites numerous cases involving prison reform for the proposition that relaxation of the burdens assumed by or imposed upon a defendant is the "typical" form of modification requested. Intervenor CHIP argues that this is a distinction without a difference, for "the State ignores the fact that the prisoners' burdens are increased when the population limits are relaxed." We think CHIP's assertion is mistaken. While we express no opinion on the question of what constitutes a typical modification request, we think it obvious that the law should assign great significance to whether a party seeking modification requests relaxation of the terms of consent decree or the imposition of additional burdens and obligations. For exam-

ple, Fed.R.Civ.P. 60(b) allows for *relief* from the terms of a consent decree where the terms are no longer equitable. *See Rufo,* —— U.S. at ——, 112 S.Ct. at 757. There appears no comparable provision addressing a party's request for an increase in the burdens of a consent judgment.[4]

Finally, we do not dispute the district court's finding that full implementation of the Lorain desegregation plan has proved to be much more expensive than originally derived by the parties and approved by the court, and that the $2 million estimates relied upon by the parties through comparison to Cincinnati appear now "wholly unrealistic." But we note that the possibility that Lorain's costs would exceed $2 million was obviously foreseeable to, and taken into account by, the parties and the court in the consent decree. By explicitly arguing that the State's liability "shall not exceed $1 million ... or 50 percent of the actual reduction of racial isolation costs, *whichever is less,*" the parties who consented to the judgment, and the district court that entered it, clearly contemplated that the costs of desegregation measures in Lorain might prove to be more expensive than anticipated (emphasis added). While we do not doubt that the infusion of an additional $9 million in state funding would ease considerably Lorain's plight in achieving the requirements of the desegregation plan, we conclude that the modification ordered in this case stands contrary to, and effectively eviscerates, the terms of the State's consent from which the district court derived its authority to enter the consent judgment.

 We hold that a district court may not, in the name of modification, circumvent the express terms of a defendant party's consent in the absence of an adjudicat-

ed or admitted violation of law. In the absence of an adjudication or admission of constitutional violation, the district court's authority to impose additional obligations on a defendant is constrained by the terms of agreement entered by the parties to the consent decree.

Nothing in this opinion vitiates either the goals of the desegregation consent decree or the integrity of the Lorain Board of Education's commitment to achieve them. Rather, our decision merely enforces the agreement reached by the defendants concerning their respective obligations—an agreement entered into and approved without an adjudication of the merits of the plaintiffs' allegations. We are sympathetic to the plight of Lorain's educators and administrators, faced with virtually limitless claims upon their very limited educational resources, and, most importantly, to the plight of its students, forced to endure many of the resulting hardships. However, none of the parties has provided authority, nor have we been able to discover any, to support the contention that, absent an adjudication of constitutional violation, the State of Ohio is legally obliged, or may be judicially ordered over its objection, to increase its share of the costs of desegregation beyond the $1 million limitation establishing the terms and scope of its consent.

Lacking an adequate legal and factual foundation for ordering the specific modification requested by the Board, the district court's order increasing the State's financial obligations under the consent decree beyond $1 million constitutes an abuse of discretion and cannot stand.[5]

## V.

The district court's judgment of June 21, 1991, eliminating the express limitations

---

**4.** We stress that the modification requested by the Lorain Board of Education is not necessarily the last word on the State of Ohio's liability, for the State may be ordered, pursuant to the district court's powers in equity, to pay a share of desegregation costs should the State at some point be *adjudicated* as having violated the constitutional rights.

**5.** In addition to the issues already addressed, the State contends that the district court's order violated the Eleventh Amendment and that the district court erred in calculating the costs of

the desegregation plan, assessing interest on the State's payments to Lorain, and ordering the State to pay the attorneys' fees incurred by the Board and CHIP in prosecuting the motion to increase the State's contribution. In their cross-appeal, the Board and CHIP, argue that the district court erred in reducing the State's share of desegregation costs to levels below 50% in the school years 1990–91 to 1993–94. Our disposition of this case makes it unnecessary to reach these issues.

placed on the State of Ohio's financial liability by consent of the parties and increasing the State's obligations over its objection and in the absence of any adjudication or admission of violation of plaintiffs' constitutional rights, is hereby REVERSED, and this case REMANDED for further proceedings in accordance with this opinion.