DAVID C., et al., Plaintiffs,

v.

Michael LEAVITT, et al., Defendants.

Civil No. 2:93–CV–206C.

United States District Court,
D. Utah,
Central Division.

Aug. 4, 1998.

Jeanne Finberg, Patrice McElroy & Martha Matthews, National Center for Youth Law, San Francisco, CA, and Harold J. McElhinny, Morrison & Foerster, L.L.P., San Francisco, CA, for Plaintiffs.

Carolyn Nichols, Carol Clawson, John Peterson, Utah Attorney General's Office, Child Protection Division, Salt Lake City, UT, for Defendants.

## ORDER

CAMPBELL, District Judge.

This matter is before the court on the plaintiffs' motion to extend the term of the consent decree. The court heard argument from counsel on July 20, 1998; Ms. Jeanne Finberg, Ms. Martha Matthews, and Ms. Patrice McElroy appeared on behalf of the plaintiffs and Ms. Carol Clawson and Ms. Carolyn Nichols appeared on behalf of the defendants. Having fully considered the arguments of counsel, the memoranda of the parties, and applicable legal authority, the court now enters the following order.

*Background* [1]

I.   *Structure of the Settlement Agreement.*

On February 25, 1993, plaintiffs initiated this class-action lawsuit against the Governor

---

[1]. The history of the case provided here is a summary of the more extensive treatment given by the Hon. David K. Winder in his Memorandum Decision and Order Granting In Part And Denying In Part Plaintiffs' Motion To Enforce Settlement Agreement and Appoint Receiver ("March 17 Order").

of the State of Utah and other state officials involved in Utah's child-welfare system (collectively referred to as "defendants"). The plaintiff class is (1) all children who are now or will be in the custody of the Department of Human Services ("DHS") and who have been or will be placed by DHS in a shelter-care facility, foster-family home, group home, or institutional care; and (2) all children who are or will be known to DHS by virtue of a report of abuse or neglect.

After substantial negotiation, the parties entered into a settlement agreement (the "SA") on May 17, 1994. The SA sets forth ninety-three provisions to be implemented by the defendants, which are designed to improve the policies and practices governing Utah's child-welfare system. In general, these provisions relate to the screening and investigation of abuse and neglect complaints; the improvement of shelter care, family services, health care, and education for foster children; preparation of treatment plans; and the training and supervision of caseworkers and foster parents.

The SA also establishes a monitoring panel consisting of three individuals: one chosen by plaintiffs' counsel, one by defendants, and one agreed upon by the parties. The panel exists to oversee defendants' implementation of the ninety-three SA provisions, to publish quarterly reports documenting the extent of defendants' compliance or noncompliance with these provisions, and to evaluate the Corrective Action Plan ("CAP") that defendants develop in response to the quarterly reports.

Finally, the SA provides that "[t]he Agreement shall terminate in 48 months from the date it is given final approval by the Court." (Settlement Agreement § XI.M.) The court gave final approval to the SA on August 29, 1994, thereby setting an expiration date of August 28, 1998. The court retained the power to "enter any necessary orders to enforce the Agreement." (Settlement Agreement § XI.J.), and also incorporated the terms of the SA by reference into its order of August 29, 1994.

*11. Parties' Performance of Procedural Obligations Under the Settlement Agreement.*

To date, the performance report/CAP feedback mechanism, which the parties had hoped would provide the defendants with significant guidance in reforming the Department of Child and Family Services ("DCFS"), has failed to function in any meaningful sense. The panel has never published performance reports on a quarterly basis as contemplated; two reports were released in 1995, one in 1996, and one in 1998. Even on those occasions when the panel did release a report, the CAP mechanism was not properly implemented. After the release of the first performance report in March 1995, the parties were to have a panel-approved CAP in place within four weeks. Instead, the two sides failed to reach any agreement and the panel failed to impose its own CAP (as allowed by the SA) until August 4, 1995. Even after the first CAP was in place, the defendants failed to relate to the panel within the ninety days allowed by the SA whether they had successfully implemented necessary changes. Nor, indeed, did the defendants provide such information to the panel at any later time.

Following release of the second report on February 2, 1996, the monitoring panel rejected several CAPs submitted by the defendants. After the last such rejection, the defendants did not submit another revised CAP and the panel did not create its own. The parties encountered similar difficulties following submission of the third report on July 3, 1996; the defendants again failed to submit a CAP in a timely manner and the panel again rejected the defendants' plan without formulating one to replace it.

Reviewing this history, Judge Winder concluded, in his March 17 Order, that there had been a "breakdown of the Corrective Action Process." (March 17 Order at 20, 6–7.) He therefore ordered that the parties suspend the ordinary procedural mechanisms required by the SA. The panel was directed to prepare a report for the months from October 1996 through March 1997. Upon submission of the report, the panel was further instructed to inform the court what resources

it would need to prepare a comprehensive plan for future action by the defendants. In August 1997, the court amended its earlier order, requiring now that the report cover the six month period from January through June 1997. The monitoring panel submitted the required report at the end of April 1998, ten months following the close of the monitoring period, and, despite Judge Winder's prior order, did not request any additional resources with which to complete· the comprehensive plan. Although plaintiffs' counsel represented at argument that the parties had made substantial efforts to complete the comprehensive plan, as of the date of this order, the monitoring panel has not filed any comprehensive plan with this court.

## III. Defendants' Performance of Substantive Obligations Under the Settlement Agreement.

The defendants have fared no better in achieving compliance with the substantive terms of the SA than in conforming to its procedural mandates. To date, both the panel and Judge Winder have found the defendants to be in noncompliance with a majority of the SA's ninety-three provisions. (March 17 Order at 21–22.) Specifically, the panel has reported the following findings (rounded to the nearest percentage) in each of its performance reports:

| Report 95–1: | % | Report 95–2: | % |
|---|---|---|---|
| Compliance | 12 | Compliance | 09 |
| Compliance with Concerns | 13 | Compliance with Concerns | 25 |
| Noncompliance with Progress | 35 | Noncompliance with Progress | 53 |
| Noncompliance | 16 | Noncompliance | 09 |
| No data/inconclusive | 24 | No data/inconclusive | 05 |

| Report 96–1: | % | Report 97–1: | % |
|---|---|---|---|
| Compliance | 04 | Compliance | 20 |
| Compliance with Concerns | 16 | ——— | |
| Noncompliance with Progress | 57 | Noncompliance with Progress | 18 |
| Noncompliance | 21 | Noncompliance | 54 |
| No data/inconclusive | 01 | No data/inconclusive | 07 |

In early 1995, therefore, the defendants were 25 percent in compliance and 75 percent in noncompliance.[2] As of the most recent report, four years after the implementation of the SA, the defendants were 20 percent in compliance and 80 percent in noncompliance. In other words, as progress is measured by the SA, there has been none. *See also* Plaintiff's Mem. Supp. at 3 ("[I]t is difficult to ascertain *any* measurable progress in the entire four-year period with the terms of the Settlement Agreement."); March 17 Order at 8 ("In Plaintiffs' view, the Reports demonstrate that … the system has actually deteriorated since the SA took effect.").

Because of the failure to achieve the anticipated goals within the four-year term contemplated by the SA, the plaintiffs have asked the court to extend the SA until two years after the date on which defendants finally achieve full compliance. Defendants oppose the plaintiffs' request, arguing that the explicit term of the SA relating to its termination date is binding upon the parties and upon this court.

## Discussion

## IV. Does this Court have the Power to Modify the Termination Date of the Settlement Agreement?

### A. General Power to Modify Judicial Orders Arising Out of Institutional Reform Litigation.

Defendants' opposition to the plaintiffs' motion is based on their contention that, as

---

**2.** The most recent monitoring panel report explains that a "No Documentation" finding is "not a neutral measure of performance. It is a finding of deficiency. While 'No Documentation' may not·be as serious as a finding of noncompliance, it does represent a failure to demonstrate performance. If it is a common finding, 'No Documentation' reflects a significant systemic problem because compliance cannot be determined." (*Executive Summary* at 5.)

with a contract, the court has no power to modify an express term of the SA to impose burdens upon the defendants to which they have not willingly consented. According to the defendants, the SA, and particularly the SA's termination date, are the result of a hard-fought compromise not to be undone by the court; defendants argue, essentially, that "in exchange for the saving of cost and elimination of risk, the parties each gave up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).

The defendants are, of course, correct, that any request for modification, either by the plaintiffs or by the defendants, should be viewed with great caution.[3] If litigants cannot rely on the courts to enforce their bargains, they will enter into them only reluctantly or not at all. It is also true, however, that the SA is not merely a private contract; the parties in this case deliberately requested that this court place its imprimatur upon their bargain by adopting it as an order of the court. Therefore, as with all consent decrees, the SA is both "a voluntary settlement agreement which could be fully effective without judicial intervention" and also "a final judicial order ... [that] places the power and prestige of the court behind the compromise struck by the parties." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983).

The simple fact that the SA is also a judicial order, and not just a contract, gives this court equitable power to modify its terms. *See Juan F. v. Weicker*, 37 F.3d 874, 878 (2nd Cir.1994) ("[I]n implementing the purposes of a decree, a court is not rigidly confined only to the terms contained within the four corners of the parties' agreement."); *Lorain NAACP v. Lorain Board of Education*, 979 F.2d 1141, 1148 (6th Cir.1992) ("Because of their dual character, consent decrees may be 'treated as contracts for some purposes but not for others.'") For example, the court would be well within its power to modify the SA should it find that failure to do so would cause its own order to become an instrument of injustice. *See Williams v. Edwards*, 87 F.3d 126, 132 n. 18 ("[A] court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.'"). Given this general inherent authority to modify judicial orders, and the existence of Section XI.J of the SA, by which the parties specifically requested that this court retain continuing power to enter any necessary modifications, the defendants' suggestion that the court treat the SA purely as a private contract is simply untenable.

Nor is the court's participation in the SA the only significant difference between this case and an ordinary contract dispute. The bargain struck by the parties affects more than the rights of the immediate litigants; the public has an independent interest in the efficacy of the child-welfare system in this State that must also be satisfied by the agreement. Although private parties are free to enter into virtually any agreement, even an ill-advised one, the parties in this case stand in a different position. If, in hindsight, the court were to find that the agreement created systemic flaws in this

---

**3.** The defendants urge that modifications placing an additional burden on a party should be evaluated under a different standard than modifications relieving a party of such a burden. The court rejects a dual standard. Any deviation from the initial terms of the settlement agreement deprives one party of its bargain, in the form of lesser benefit to the plaintiffs or greater duties imposed upon the defendants. The potential harm resulting from any such modification is therefore the same—future litigants, aware that their settlement terms are not completely binding upon the court, may be more reluctant to settle their claims. Thus, there is no good reason in logic to view one type of modification more favorably than the other.

The few courts to address this issue have reached a similar conclusion: "[W]e reject defendants' suggestion that the *Rufo* standard for flexible modification can benefit only defendants seeking relief from burdensome requirements. *Rufo*'s flexibility is designed to permit details in complicated decrees, much as this one, to be adapted to changing conditions so that the public interest can be preserved." *Juan F. v. Weicker*, 37 F.3d 874, 879 (2nd Cir.1994). *See also Johnson v. Robinson*, 987 F.2d 1043, 1050 (4th Cir. 1993) (citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 379–80, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)).

State's child-welfare system or required the expenditure of limited funds in a counterproductive manner, it would be no defense to modification to assert that the parties freely bargained for the obligation in question. As Judge Posner has noted in the context of other institutional reform litigation:

> A consent decree that regulates a public agency "is no mere contract, even though reference to contract principles may be useful ." This is not to say that the decree ought just be discarded .... No one will sign a consent decree if the other party is free to walk away from it. But in deciding whether to modify a decree the district judge cannot just appeal to the sanctity of contracts; he must consider the concrete impact of modification on both parties, and also on the public.

*Duran v. Elrod,* 760 F.2d 756, 760 (7th Cir. 1985) (quoting *New York State Assn. for Retarded Children, Inc. v. Carey,* 596 F.2d 27, 37 (2nd Cir.1979)). Because the SA has a significant impact on nonlitigants, the terms chosen by the parties are entitled to deference, but not dispositive weight. This court cannot confine itself solely to an examination of the parties' preferences, turning a blind eye to the impact of those preferences on the public interest.

Finally, those circuit courts which have addressed the problems of long-term institutional reform litigation have also found broad powers of modification necessary if the district court is to incorporate its growing experience under the decree in a common sense fashion. *See, e.g., Lorain NAACP,* 979 F.2d at 1149 ("[B]roader judicial discretion to modify the parties' agreement 'is required so that the agreed upon solution to the problem giving rise to the litigation may be fine-tuned to accomplish its goal.'"); *Kozlowski v. Coughlin,* 871 F.2d 241, 247 (2nd Cir.1989) ("'As experience with [institutional reform] litigation increases, a consensus is emerging among commentators in favor of modification with a rather free hand.'"); *Alberti v. Klevenhagen,* 46 F.3d 1347, 1365 (5th Cir.1995) ("[T]here is little question that the district court has wide discretion to interpret and modify a forward-looking consent decree."). Therefore, in light of the SA's status both as a judicial order and as a settlement arising out of institutional reform litigation, the court finds that it has more power to enter modifications than if this were, as defendants urge, simply a matter of contract interpretation.

### B. *Limitations on the Court's Power to Modify the SA.*

■ Although the court is not constrained to simple obedience to the parties' terms, neither is its power to entertain modifications unlimited. In its recent decision in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court endorsed the flexible standard promulgated by the lower courts:

> A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees ....

> The upsurge in institutional reform litigation ... has made the ability of a district court to modify a decree in response to changed circumstances all the more important.

> The experience of the District Courts ... in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of the litigation. The Courts of Appeals have also observed that the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions."

*Rufo,* 502 U.S. at 378–79, 381, 112 S.Ct. 748 (quoting *Heath v. De Courcy,* 888 F.2d 1105, 1109 (6th Cir.1989)).

As the Court also noted, though, an unfettered power of modification would render the actual terms of the parties' agreement nugatory and discourage settlement. *Id.* at 383, 112 S.Ct. 748. The Supreme Court therefore imposed a single prerequisite upon district courts' exercise of equitable power:

Although we hold that a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application," not when it is no longer convenient to live with the terms of the consent decree. Accordingly, a party seeking modification of a consent decree *bears the burden of establishing that a significant change in circumstances warrants a revision of the decree* ....

*Id.* at 383, 112 S.Ct. 748 (emphasis added) (internal citations omitted). The requirement of changed circumstances strikes the necessary balance between the public interest and the reasonable expectations of the parties by ensuring that no party will lose the benefit of its bargain absent some unanticipated and objectively verifiable circumstance.

█ Although there are no identifiable *changed* circumstances in this case, there are certainly unforeseen forces at work. *Id.* at 384, 112 S.Ct. 748. The defendants have increased the funding to DCFS by 108.1%, from $48,902,700 in 1994 to $101,755,600 in 1997, yet these efforts have been accompanied by an actual decline in compliance with the terms of the SA: 25% in 1994 and 20% today.[4] Neither the parties nor the court could have predicted back in 1994 that very substantial increases in funding would lead to higher levels of noncompliance with the SA. Such unforeseen circumstances provide an objective basis for equitable intervention by this court to rescue, if necessary, the purposes of the agreement. *Id.* at 384, 112 S.Ct. 748 ("Modification is also appropriate when a decree proves to be unworkable because of unforeseen circumstances."). The court

therefore concludes that it has power to entertain plaintiff's motion.

## V. Should the Court Exercise its Discretionary Power to Modify?

█ This court's determination that it has power is only part of the inquiry, however; whether the court should use its power is a separate question. Although the higher courts have articulated very few factors for this court to consider in the exercise of its discretion, there is no doubt that the court must determine whether the proposed modification furthers the purpose of the consent decree. *See Kozlowski v. Coughlin,* 871 F.2d 241, 247–8 (2nd Cir.1989) ("The analysis must identify the essential purpose or purposes of the decree in question and weigh the impact of the proposed modification on that ultimate objective."); *Lorain NAACP,* 979 F.2d at 1148 ("The modification of an institutional consent decree will be upheld 'if it furthers the original purpose of the decree in a more efficient way.'"). In determining whether to exercise its power, then, the court must determine whether the modification requested by the plaintiffs serves the purpose of the SA by improving child welfare.

Even if it works well, the SA does not come without some cost to the plaintiffs. Funds that would otherwise be available for the direct provision of services to the plaintiff class must be diverted to a system of secondary oversight. When the oversight mechanisms work, when they produce useful feedback and a history of successful, measurable results, the resulting gains to the plaintiff class will outweigh the somewhat diminished services that they receive. When the oversight mechanisms do not work, however, the maintenance of the SA is nothing more than a net loss of direct services to the children of this State.

---

**4.** The defendants asserted at oral argument that the SA measurement devices focus on improper factors and do not actually measure increases in child welfare. There is some appeal to the defendants' argument on this point. It is hard to imagine that a 49% increase in supervisors, a 60% increase in caseworkers, a 49% increase in support staff, and the hiring of 42 new contract case workers has actually led to a 5% decline in child welfare as the panel report suggests. Nev-

ertheless, the defendants' standing to make such an argument is substantially undercut by two facts. First, the defendants, who have great expertise in this area, agreed in 1994 that the SA measurement devices were suitable for use in this case. Second, despite the court's broad powers to modify the terms of the SA, the defendants have, in four years, never made a motion to modify on the ground that the measurements were inaccurate.

The plaintiffs repeatedly insist that there has been no measurable improvement in child welfare in the last four years. The plaintiffs may well be right. During the four years of experience under the SA, the feedback mechanisms designed by the parties have proven to be unworkable or unrealistic. The panel has never been able to complete quarterly reports as anticipated and has only approved one CAP for implementation by the defendants. The defendants, in turn, failed ever to report back to the panel on their progress under that lone CAP. Thus, the quarterly dialogue between the panel and DCFS envisioned in the SA has been almost nonexistent. Perhaps as a result of this failure of communication, or perhaps for other reasons discussed above, the SA has registered a net decline of child welfare even while the State increased its funding of DCFS by 108.1%.

None of this history relied upon by the plaintiffs provides a persuasive rationale for pumping more money into a settlement that has, according to its strongest proponents, completely failed. To the contrary, without some additional proposal for reforming the system so that it will work, continued funding of the SA at this point would appear to be nothing more than throwing good money after bad.[5] Without some better justification, the court will not order the defendants to divert additional funds away from direct services to the plaintiff class without a demonstrable corresponding benefit. Because the proposed modification, an extension of the life of the SA, would not be likely to provide a benefit to the plaintiff class, the court declines to extend the SA. *See Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir.1994) (upholding extension of decree where district court found that "the goals of the decree 'will be fulfilled in a short period of time and this action will then come to an end.'").

The end of the SA does not necessarily leave plaintiffs without a remedy, however. If the parties are able negotiate a new settlement agreement that incorporates the lessons acquired in the last four years, this court will certainly give a hard look at such a proposal. And even if the parties cannot reach a new agreement, the plaintiffs remain free, as they always have been, to initiate new litigation to determine the existence or nonexistence of current constitutional violations.

### Order

For the foregoing reasons, plaintiffs' motion to extend the term of the settlement agreement is DENIED.

---

**5.** Plaintiffs recognize this problem and suggest that following extension of the SA, they may come to the court with additional motions for modification to compensate for any deficits in the current arrangement. *See* Plaintiff's Supp. Mem at 15 ("[P]laintiffs are not at this time asking the Court to make any specific rulings on how compliance ... is to be achieved. That issue may need to be addressed in a subsequent motion ...."). The court cannot proceed in this manner, though, because it has no basis for weighing the merit of those unspoken requests. The court cannot indefinitely extend the life of the SA as part of an exercise in speculation about which changes plaintiffs might propose in the future, when they might propose them, and if those proposed changes will have the necessary effect. The only issue which the court can fairly consider at this point is whether to extend the life of a failed agreement.