62 F.3d 1418
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
STATE OF MICHIGAN, et al., Defendants-Appellants.
 Nos. 94-2391, 95-1258.
 United States Court of Appeals, Sixth Circuit.
 Aug. 7, 1995.
 
 Before: MILBURN and NORRIS, Circuit Judges; BECKWITH, District Judge*
 MILBURN, Circuit Judge.
 
 
 1
 In these consolidated appeals, defendants, the State of Michigan and various state officials, appeal three orders of the district court relating to a consent decree, which concerned conditions of confinement of state inmates at three prisons in the State. The consent decree was entered into between the United States and the State of Michigan pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. Secs. 1997-1997j. On appeal, the issues are (1) whether the district court failed to properly apply the standard for modification of an institutional reform consent decree set forth in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), when it (a) rejected defendants' proposed method for calculating mental health bedspace requirements and (b) enforced the consent decree by ordering certain remedial measures; (2) whether the remedial measures ordered by the district court were improper and overly intrusive in the absence of proof of constitutional violations; (3) whether the district court lacked jurisdiction to issue its order of February 22, 1995, which modified the district court's September 1994 orders, while those orders were subject to the appellate jurisdiction of this court; and (4) whether the relief provided for in the district court's order of February 22, 1995, was proper. For the reasons that follow, we affirm in part and reverse in part.
 
 I.
 A.
 
 2
 The complaint in this case was filed on January 18, 1984, by the United States Department of Justice pursuant to its authority under CRIPA. After nearly two years of investigation and negotiation with the State of Michigan over the conditions at three major penal institutions, namely, the State Prison of Southern Michigan ("SPSM"), the Michigan Reformatory ("MR"), and the Marquette Branch Prison ("MBP"), the United States filed an action against the State under CRIPA. Contemporaneous with the filing of its complaint, the United States filed a motion for dismissal of the case and for entry of a proposed consent decree, which had resulted from its negotiations with the State.[1]
 
 
 3
 The parties' agreement in this case is set forth in the consent decree and the state plan for compliance which is attached to the consent decree. J.A. 260-315. The state plan covers conditions relating to medical and mental health care; fire safety; sanitation, safety, and hygiene; crowding and protection from harm; and access to courts and legal mail. In these consolidated appeals, the State challenges orders entered by the district court on September 6, 12, and 21, 1994, and February 22, 1995, which deal exclusivly with mental health care. In those orders, the district court, among other things, (1) rejected the State's proposal to modify the consent decree; (2) provided defendants two additional years until June 1, 1996, to comply fully with their 1991 obligation to provide mental health bedspace based on a fixed percentage of capacity; and (3) found defendants had violated various provisions of the consent decree and state plan and ordered remedial measures, namely, a new data tracking system, to ensure compliance.
 
 
 4
 Paragraph A of the consent decree, which deals with medical care, states that "[d]efendants shall provide adequate ... mental health services ... to respond to the serious needs of prisoners." J.A. 248. The decree also requires defendants to provide "[a]dequate treatment upon timely identification for those inmates with serious mental illness, ... [r]easonable protection measures for those inmates identified as suicidal or self-mutilating, ... [and] [p]rofessional medical record-keeping systems. J.A. 249-50. Paragraph H of the consent decree states that "[d]efendants have developed their own comprehensive plan, entitled 'State Plan for Compliance,' ... [and] intend to fully implement the State Plan unless implementation is excused or modified in accordance with the terms of this Decree." J.A. 253-54.
 
 
 5
 In addition, the state plan requires defendants to provide care to inmates with "serious mental illness" which meets "contemporary professional standards." J.A. 275-76. This includes "suitable separated housing adequate to house every inmate who exhibits a serious threat of suicide or who attempts suicide," "inpatient services for serious mental illness," and "systematic outpatient care, follow-up care, as well as continuity of care for inmates with serious mental illness." J.A. 277-78. Finally, the state plan obligates defendants to "take appropriate measures to assure that psychiatric/medical care is coordinated with psychological care ... includ[ing] the coordination of record-keeping between psychiatrists and psychologists." J.A. 280.
 
 
 6
 On May 9, 1986, the district court entered an order granting the United States motion for relief and sanctions, which "provide[d] for compliance with [the] recommendations of the April 1986 Report of the Independent Expert." J.A. 317. The Independent Expert report recommended revision of the state plan "so as to maintain an inpatient facility capacity (for all three levels: hospitalization, comprehensive care, and protected environments) of not less than 3.2% of the system capacity or [inmate] population, whichever is greater." J.A. 325. The report further stated that the "proposed inpatient hospitalization proportion (1.0%) is not unreasonable, if an acceptable amount of comprehensive care ("CCU") capacity exists." J.A. 326.
 
 
 7
 In an opinion issued on October 15, 1990, in which the district court held defendants in contempt for failure to comply with their schedule to construct a new correctional mental health facility, the district court noted that defendants submitted an "Implementation Schedule and Specification" for the state plan on October 24, 1986. The court stated that
 
 
 8
 [i]n the Schedule and Specification, the defendants agreed to maintain inpatient mental hospitalization bedspace available for prisoners equal to 1% of the prisoner population, and total inpatient mental health bedspace equal to 3.2% of the prisoner population. This included several substantial reductions of bedspace requirements associated with the initial plan submitted by the defendants.
 
 
 9
 J.A. 377-78. The court also noted that it had "deferred specific enforcement of the fixed-percentage requirement, and also permitted the defendants to propose adjustments in the types of inpatient bedspace to be developed." J.A. 378.
 
 
 10
 In May 1991, the parties entered into a stipulation which was accepted by the district court. The stipulation provides in relevant part:
 
 
 11
 By May 1, 1994, defendants must have developed and implemented, and must thereafter maintain aggregate mental health bedspace capacity equal to or greater than 3.2% of prison population (not including community residential programs) of which acute care bedspace must be equal to or greater than 1% of prison population, unless the Court approves an alternate proposal. Defendants may not close, relocate, or modify (as to program type) inpatient treatment units currently operational, without approval by the Court.
 
 
 12
 J.A. 465.
 
 
 13
 Subsequently, on April 15, 1983, defendants submitted a plan which detailed their intent to comply with the May 1991 stipulation requiring mental health bedspace capacity equal to or greater than 3.2% of the prison population. In their plan, they agreed to provide a total of 1224 mental health beds by May 1, 1994. J.A. 512. The defendants plan also stated:
 
 
 14
 Although this plan states how the Defendants intend to meet the fixed percentage bed requirement, the Department of Mental Health is currently working toward the development of a statistical model to project bed need. The data from this model, when used in conjunction with other data being collected may, over time, be considered when determining the number and types of beds required to adequately meet the mental health needs of prisoners in the Department of Corrections.
 
 
 15
 J.A. 514.
 
 
 16
 Thereafter, on April 1, 1994, defendants filed a motion seeking modification of the district court's orders relating to fixed-percentage mental health bedspace capacity. J.A. 517-522. Essentially, defendants sought modification of the parties' May 1991 stipulation which required them to maintain an aggregate mental health bedspace capacity equal to or greater than 3.2% of the Michigan prison population. In their motion, defendants proposed (1) to replace the fixed-percentage method of calculating mental health bedspace capacity with an alternative method for calculating mental health bedspace requirements, a utilization methodology (simulation modeling), known as the Discrete Event System Simulation ("DESS") modeling;[2] (2) to have the May 1991 stipulation modified to eliminate their obligation to achieve and maintain the fixed-percentage bedspace capacity by May 1, 1994; and (3) have the deadline for opening additional mental health beds extended from May 1, 1994, to December 30, 1994. J.A. 521-22. The DESS simulation model would have resulted in the State providing less mental health bedspace capacity than the fixed-percentage bedspace method of determining bedspace capacity.
 
 
 17
 On April 28, 1994, the district court held an evidentiary hearing on defendant's motion to modify multiple orders requiring them to provide mental health bedspace capacity based on a fixed-percentage of the prison population. Thereafter, on September 6, 1994, the district court issued an opinion and order granting in part and denying in part defendants' motion to modify the consent decree and May 1991 stipulation concerning mental health bedspace capacity. The district court rejected defendants' proposal to substitute the DESS for the fixed-percentage method of determining "the bedspace capacity of residential mental health programs." J.A. 679. However, the district court did not require defendants to fully comply with the fixed-percentage requirements set forth in the May 1991 stipulation until June 1, 1996, and it granted defendants' request to postpone the opening of certain mental health beds from May 1, 1994 to December 30, 1994. J.A. 712. Finally, the court found that defendants had violated various provisions of the consent decree and the state plan and ordered certain remedial measures to ensure compliance. J.A. 695-96, 705-09.
 
 
 18
 In its order of September 6, 1994, the district court rejected defendants' proposal to calculate mental health bedspace requirements using the DESS model. Applying the Supreme Court's decision in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), the district court refused to modify the May 1991 Stipulation requiring mental health bedspace based on a fixed-percentage of the prison population on the ground that defendants "have provided virtually no evidence that there has been any substantial change in the factual or legal circumstances of which the parties were not aware in 1991 when the Stipulation was adopted by this Court." J.A. 686. The district court noted that the DESS "has profound technical problems," J.A. 700, and that the DESS "database does not reflect significant dimensions of the need for treatment of serious mental illness," J.A. 697. The district court further noted that the "DESS method ... has never been used to predict mental health capacity needs," and it "has never been used before in a correctional setting." J.A. 700. The court further noted that the assumption underlying the DESS model "were selected so that the results from the model would fit pre-existing conditions." J.A. 700. Thus, the district court concluded that it "cannot rely on the [DESS] findings as a sufficient basis for determining whether adequate mental health treatment capacity is available in the corrections system." J.A. 700.
 
 
 19
 The district court also found that defendants violated various provisions of the consent decree and the state plan based on their failure to provide adequate access to care. Specifically, the district court found that defendants had not complied with Paragraphs A.5 and A.6 of the consent decree and Paragraphs II.H.3 and II.H.4 of the state plan. J.A. 695-96. Accordingly, the district court ordered defendants to "submit a ...[p]lan defining the admission and discharge criteria for each level of mental health care and improvements to be made in the design and implementation of the mental health care recording system and computerized tracking system." J.A. 713. Subsequently, on September 12 and 21, 1994, the district court issued orders modifying in minor respects its order of September 6, 1994. J.A. 723-27. Thereafter, on November 1, 1994, defendants filed a timely notice of appeal [Case No. 94-2391] challenging the district court's orders of September 6, 12, and 21, 1994.
 
 
 20
 Thereafter, on December 1, 1994 and December 6, 1994, respectively, defendants filed a motion requesting an extension of the December 30, 1994 deadline to comply with the district court's order of September 6, 1994, and an emergency motion for a stay pending appeal of the district court's orders of September 6, 12, and 21, 1994. On February 22, 1995, the district court issued two separate orders and opinions. J.A. 888-911. First, the district court denied defendants' emergency motion for a stay pending appeal. J.A. 904. Second, the district court reduced the number of mental health beds which defendants were required to open in 1995 and extended the deadline for those two different types of mental health beds until April 30, 1995, and December 31, 1995. J.A. 909. On March 6, 1995, defendants filed a second notice of appeal [Case No. 95-1258] challenging the district court's orders of February 22, 1995.
 
 
 21
 Subsequently, on March 15, 1995, defendants filed an emergency motion for a stay pending appeal with this court, seeking a stay of those portions of the district court's orders requiring them to open certain beds by April 30, 1995, December 31, 1995, and June 1, 1996, respectively. Plaintiff filed a response to defendant's emergency motion on March 23, 1995. On April 7, 1995, we issued an order granting in part and denying in part defendant's request for a stay. J.A. 922-23. We granted defendants' request for a stay of the April 30, 1995 deadline; however, we denied a stay of either the December 31, 1995, or June 1, 1996 deadlines. J.A. 923.
 
 B.
 
 22
 Numerous experts testified at the April 28, 1994 evidentiary hearing. In addition, the district court also had before it reports from various experts which it considered along with the expert testimony. Rather than making a lengthy summary of this testimony and evidence, we have referred to it, where necessary, in our discussion of the issues, as set forth below.
 
 II.
 A.
 
 23
 Defendants argue that the district court abused its discretion when it denied their request to modify the consent decree by "fail[ing] to relieve Michigan from the intrusive relief of enforcement of determining further mental health bedspace based upon an arbitrary fixed percentage of prison population," and "in modif[ying] Michigan's obligations under the decree without requisite evidence that noncompliance existed." Appellants' Brief at 24-25. Specifically, defendants assert that the district court did not properly apply the standard for modification of an institutional reform decree set forth in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), in rejecting Michigan's request for modification of the consent decree and in modifying Michigan's mental health obligations under the decree.
 
 
 24
 (1)
 
 
 25
 We "review[] a district court's modification of a consent decree under an abuse of discretion standard."[3] Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1017 (6th Cir. 1994) (citing Lorain N.A.A.C.P. v. Lorain Bd. of Educ., 979 F.2d 1141, 1147-48 (6th Cir. 1992), cert. denied, 113 S. Ct. 2998 (1993)). Likewise, a district court's refusal to modify a consent decree is also reviewed for an abuse of discretion. Ensley Branch, N.A.A.C.P. v. Seibels, 31 F.3d 1548, 1563 (11th Cir. 1994). ""'A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.""' Lorain N.A.A.C.P., 979 F.2d at 1148 (quoting Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 479 (6th Cir. 1987)(quoting Christian Schmidt Brewing Co. v. G. Heilman Brewing Co., 753 F.2d 1354, 1356 (6th Cir.), cert. dismissed, 469 U.S. 1200 (1965)). Moreover, "[m]odification of a consent decree requires 'a complete hearing and findings of fact."' Akers v. Ohio Dep't of Liquor Control, 902 F.2d 477, 479 (6th Cir. 1990) (per curiam) (quoting Brown v. Neeb, 644 F.2d 551, 560 (6th Cir. 1981)).
 
 
 26
 "A consent decree is a strange hybrid in the law." Brown, 644 F.2d at 557. "It is both 'a voluntary settlement agreement which could be fully effective without judicial intervention and 'a final judicial order ... plac[ing] the power and prestige of the court behind the compromise struck by the parties." Vanguards, 23 F.3d at 1017 (quoting Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983)). "[A] consent decree is a 'settlement agreement subject to continued judicial policing."' Id. "[T]he "'scope of a consent decree must be discerned within its four corners, and not be reference to what might satisfy the purposes of one of the parties to it"' or by what "'might have been written had the plaintiff established his factual claim and legal theories in litigation.""' Id. (quoting Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574 (1984) (quoting United States v. Armour & Co., 402 U.S. 673, 681-82 (1971)). Nevertheless, a consent decree "should be construed to preserve the position for which the parties bargained." Vogel v. City of Cincinnati, 959 F.2d 594, 598 (6th Cir.) (citing Williams, 720 F.2d at 920), cert. denied, 113 S. Ct. 86 (1992).
 
 
 27
 However, because "judicial approval of a consent decree places the power and prestige of the court behind the agreement reached by the parties," Vanguards, 23 F.3d at 1018 (citing Williams, 720 F.2d at 920), "'[o]nce approved, the prospective provisions of the consent decree operate as an injunction,"' id. (citing Williams, 720 F.2d at 920). "The injunctive quality of a consent decree compels the approving court to: (1) retain jurisdiction over the decree during the term of its existence, (2) protect the integrity of the decree with its contempt powers, and (3) modify the decree if 'changed circumstances' subvert its intended purpose." Vanguards, 23 F.2d at 1018 (citing Williams, 720 F.2d at 920). "Further, even if the consent decree does not expressly grant the district court jurisdiction to modify the decree, it is well-settled that "'courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them.""' Vanguards, 23 F.2d at 1018 (quoting Sarabia v. Toledo Police Patrolman's Ass'n, 601 F.2d 914, 917 (6th Cir. 1979) (quoting Aro Corp. v. Allied Witan Co. 531 F.2d 1368, 1371 (6th Cir.), cert. denied, 429 U.S. 862 (1976))).
 
 
 28
 In Heath v. DeCourcy, 888 F.2d 1105 (6th Cir. 1989), this court set forth the standard for modification of consent decrees arrived at by mutual agreement of the parties. We stated that "[t]o modify such consent decrees, the court need only identify a defect or deficiency in its original decree which impedes achieving its goal, either because experience has proven it less effective, disadvantageous, or because circumstances and conditions have changed which warrant fine-tuning the decree.'
 
 
 29
 Vanguards, 23 F.3d at 1018 (quoting DeCourcy, 888 F.2d at 1110). Subsequently, the Supreme Court decided Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), in which the Court "adopted a slightly more restrictive but flexible standard to be applied by the courts in rulings on motions to modify consent decrees under Federal Rule of Civil Procedure 60(b)." Vanguards, 23 F.3d at 1018. We described the impact of the decision in Rufo this way:
 
 
 30
 Under Rufo, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." The party "seeking modification of a consent decree may meet its initial burden by showing either a significant change in factual conditions or the law." Modification of a consent decree is appropriate: (1) "when changed factual conditions make compliance with the decree substantially more onerous," (2) "when a decree proves to be unworkable because of unforeseen obstacles," or (3) "when enforcement of the decree without modification would be detrimental to the public interest." But "modification should not be granted where a party relied upon events that actually were anticipated at the time it entered into a decree."
 
 
 31
 Vanguards, 23 F.3d at 1018 (citations omitted).
 
 
 32
 The consent decree at issue in Rufo involved prison reform litigation, i.e., institutional reform litigation. In Lorain N.A.A.C.P., we held that a consent decree involving school desegregation, namely, institutional reform litigation, was subject to the same standards enunciated in Rufo and Heath. Lorain N.A.A.C.P., 979 F.2d at 1149. "Further, in Lorain NAACP, this court summarized the reasons why a lesser showing was sufficient for the modification of 'consent decrees entered in settlement of so-called "institutional reform" litigation involving and affecting the operation of governmental institutional or organizations."' Vanguards, 23 F.3d at 1019 (quoting Lorain N.A.A.C.P., 979 F.2d at 1148. "First, institutional consent decrees "'affect more than the rights of immediate litigants.""' Id. (quoting Lorain N.A.A.C.P., 979 F.2d at 1149) (quoting Heath, 888 F.2d at 1109)). "Second, broad judicial discretion to modify the consent decree "'is required so that the agreed upon solution to the problem giving rise to the litigation may be fine-tuned to accomplish its goal.""' Id. (quoting Lorain N.A.A.C.P., 979 F.2d at 1149) (quoting Heath, 888 F.2d at 1109)). "Finally, the courts require the ability to modify consent decrees in the institutional reform context because 'such [consent] decrees often remain in place for extended periods of time, [and therefore] the likelihood of significant changes occurring during the life of the decree is increased."' Id. (quoting Lorain N.A.A.C.P., 979 F.2d at 1149) (quoting Rufo, 502 U.S. at 380).
 
 
 33
 Furthermore, in dealing with consent decrees impacting on state penal institutions, we must keep in mind, as the Supreme Court has stated, that
 
 
 34
 It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons *** The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.
 
 
 35
 Kendrick v. Bland, 740 F.2d 432, 437 (6th Cir. 1984) (citing Preiser v. Rodriguez, 411 U.S. 475, 491-92 (1973)). Such
 
 
 36
 [J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the providence [sic] of the Legislative and Executive Branches of our Government not the Judicial.
 
 
 37
 Kendrick, 740 F.2d at 438 (quoting Bell v. Wolfish, 441 U.S. 520, 548 (1979)).
 
 
 38
 (2)
 
 
 39
 Defendants argue that the district court abused its discretion when it "failed to relieve Michigan from the orders requiring mental health bedspace to be determined by an arbitrary fixed percentage by improperly applying the standards" for modification of a consent decree. Appellants' Brief at 28. Defendants assert that the district court should have granted modification of the consent decree by substituting DESS as the method to determine mental health bedspace needs rather than a fixed-based percentage because: (1) "[t]he [s]imulation model chosen by Michigan to determine bedspace use is the best methodology to determine bedspace need," and (2) "the federal court must defer to the modification proposed by state officials administering the correctional system due to the principles of public interest and federalism." Appellants' Brief at 31.
 
 
 40
 Defendants' arguments to the contrary, the district court did not abuse its discretion when it refused modification of the consent decree and the May 1991 stipulation by denying defendants' proposal to calculate mental health bedspace requirements using the DESS model in lieu of a fixed-percentage. In this case, defendants have not satisfied their burden of showing grounds for modification.
 
 
 41
 Here, the district court properly rejected substitution of the DESS model for the fixed-percentage method, at least at the present time. First, the record shows that the DESS model has never been previously used in a correctional setting or to predict mental health capacity needs. Second, the district court properly found that the DESS model "has not been demonstrated to be a dependable predictor of bedspace needs." J.A. 700. Indeed, Dr. Lowery testified that when she ran the data for the DESS model, the occupancy rate predicted by the model for 1993 "was not consistent with the actual occupancy." J.A. 1208. Finally, the district court also correctly found that the assumptions underlying DESS "were selected so that the results from the model would fit pre-existing conditions." J.A. 700. Dr. Lowery testified that when the assumptions for average length of stay were made, "a conscious decision" was made "that treatment patterns in the future will follow this utilization pattern." J.A. 1210.
 
 
 42
 Furthermore, the district court also did not abuse its discretion in rejecting the DESS method because it found there were problems with the database used for the model, i.e., the utilization database. As the district court stated, "it is very likely that the utilization database does not reflect significant dimensions of the need for treatment of serious mental illness." J.A. 697.
 
 
 43
 In this case, there is ample evidence that the database for the DESS underestimates mental health bedspace needs. Dr. Lowery testified that "many patients" who were not discharged as of September 18, 1993, were not included in the DESS database because she did not know when they would be discharged. J.A. 1207. Dr. Lowery characterized this situation as being "not good." Id. Moreover, the court's independent experts, Drs. Benton and James, stated in their report that the "utilization database does not reflect all prisoners in need of service, and ... does not fully reflect appropriate placements." J.A. 652. Further, the independent experts identified "several apparent breakdowns in the [data] tracking system" for the DESS, and they characterized "an effective tracking system" as "a necessary element of a utilization based system." J.A. 654. Finally, the independent experts found that the decision making practices in treatment and placement of inmates with mental health problems were inconsistent because "there is no single official policy that states the criteria for admission to inpatient services in a way that differentiates between the levels of care available." J.A. 657. They further explained that "[t]o the extent that the utilization database reflects incomplete information by clinical decision makers about policy as to the appropriate use of available treatment capacity, the [b]edspace [s]tudy will be affected." J.A. 657. Accordingly, we conclude that the district court did not abuse its discretion when it refused to substitute the DESS method for the fixed-percentage method of determining mental health bedspace requirements. There was ample evidence, at least as of April 1994, that the DESS model was unproven in the mental health or correctional setting, as well as evidence that the utilization database for the DESS model was flawed, to support the district court's rejection of the DESS model.
 
 
 44
 (3)
 
 
 45
 Defendants argue that the district court exceeded its authority when it modified the consent decree and state plan and ordered them to: (1) submit a plan to improve "the design and implementation of the mental health care recording system and computerized tracking system," J.A. 727; (2) submit a plan "defining ... uniform admission and discharge criteria for each level of mental health care," J.A. 727; (3) have "all prisoners admitted to an RTP [residential treatment program] from facilities subject to the [c]onsent [d]ecree ... first be admitted to, and receive a comprehensive evaluation from, an acute inpatient unit or a CCU" [continuing care unit], J.A. 725; and (4) have "[a]ll prisoners discharged from acute psychiatric units ... be admitted, evaluated, and discharged from a CCU for transitional followup care, unless a psychiatrist orders ... an alternate disposition," J.A. 725.
 
 
 46
 The district court's orders at issue here "are indisputably modifications of the consent decree, which are injunctive in nature." United States v. Michigan, 940 F.2d 143, 150 (6th Cir. 1991). "[W]hen litigation involves a remedial plan, revisions to the plan, and efforts to enforce compliance, an assessment of the afforded ... relief will ... require plenary review ...." Id. at 152.
 
 
 47
 Nevertheless, "the prospective provisions of [a] consent decree operate as an injunction." Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983). "The injunctive quality of consent decrees compels the court to: 1) retain jurisdiction over the decree during the term of its existence; 2) protect the integrity of the decree with its contempt powers; and 3) modify the decree should 'changed circumstances' subvert its intended purpose." Id. (citations omitted). "[A] district court is not simply empowered, but is actually obligated, to exercise its independent judgment regarding compliance with a decree." United States v. Michigan, 18 F.3d 348, 351 (6th Cir.), cert. denied, 115 S. Ct. 312 (1994).
 
 
 48
 "'[A] court has an affirmative duty to protect the integrity of its [consent] decree. This duty arises where the performance of one party threatens to frustrate the purpose of the decree." Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985) (quoting Stotts v. Memphis Fire Dep't, 679 F.2d 541, 557 (6th Cir. 1982), rev'd on other grounds, 467 U.S. 561 (1984)). A party "who has obtained the benefits of a consent decree--not the least of which is the termination of the litigation--cannot then be permitted to ignore such affirmative obligations as were imposed by the decree." Id. Moreover, "[a] federal court has broad equitable remedial powers." Stone v. City and County of San Francisco, 968 F.2d 850, 861 (9th Cir. 1992), cert. denied, 113 S. Ct. 1050 (1993). A district "court's choice of remedies is reviewed for an abuse of discretion." Id. (citing Swann v. Charlotte-Mecklenberg Bd. of Educ., 402 U.S. 1, 15 (1971)).
 
 
 49
 First, the district court did not abuse its discretion when it ordered defendants to submit a plan which would improve "the mental health record system and the computer-based tracking system." J.A. 709. The evidence of record shows that the mental health record-keeping and computer tracking systems are currently deficient, but are also essential to providing adequate care, monitoring defendants' compliance with the consent decree, and assessing the mental health needs of inmates in facilities covered by the consent decree.
 
 
 50
 In the consent decree, defendants agreed to provide "[p]rofessional medical record-keeping systems." J.A. 250. The state plan further "requires that care of serious mental illness meet contemporary professional standards," J.A. 276, and "include[s] the coordination of record-keeping between psychiatrists and psychologists," J.A. 280.
 
 
 51
 In their report to the court, the independent experts "identified several apparent breakdowns in [defendants'] tracking system," particularly with respect to prisoners who were receiving mental health treatment, but who were "not identified on the tracking system." J.A. 654. Accordingly, the independent experts explained that "[i]n some instances, the failure to record [a] prisoner in the tracking system may have contributed to the lack of appropriate and timely follow up." J.A. 657. The independent experts further stated that they supported the development of "an effective tracking system," because it: (1) "enhances the capability of the mental health care system to identify prisoners who need care," and (2) "provides important program utilization data." J.A. 654.
 
 
 52
 Furthermore, in his testimony Dr. Metzner detailed the problems with defendants' current record system. Dr. Metzner testified that he advised defendants "to develop a management information system, which one thing a management information system does--not the only thing--is tracking." J.A. 1248. Dr. Metzner further opined that it would be necessary for defendants to supplement their DESS "model with an accurate management information system. I don't think that they have done that, and I think until recently they haven't been thinking in terms of that." J.A. 1248. As one example of the problems with defendants' current record system, Dr. Metzner described the data which defendants had provided to him concerning the percentage of inmates who suffered from schizophrenia. Dr. Metzner stated that the information which defendants supplied to him was "incomplete" and that he could not determine an "accurate number" of inmates who had schizophrenia based on the information. J.A. 1249.
 
 
 53
 Second, the district court did not abuse its discretion when it ordered defendants to submit a plan providing for uniform admission and discharge criteria for the various levels of mental health care. The evidence of record shows that on occasion defendants have failed to identify and properly treat inmates with serious mental illnesses due, at least in part, to an absence of uniform treatment policies.
 
 
 54
 In their report, the independent experts addressed defendants' failure to properly treat inmates with serious mental illness. They stated that "the outpatient services for the SPSM complex are understaffed and assigned caseloads that include patients who should be treated in higher levels of mental health care." J.A. 657. The independent experts also reviewed five inmate suicides which occurred in 1993 and early 1994. J.A. 655-57. They stated that "the medical record raises the question as to whether members of the OPT [outpatient staff] should have taken steps to admit the prisoners to acute care, or to arrange placement to another level of residential mental health care." J.A. 657. Moreover, Dr. Metzner also testified about the five suicides. He stated that one of the suicides was "a very problematic suicide because I think it represents issues around access [to treatment] and identification [of mental illness]." J.A. 1242.
 
 
 55
 Moreover, the record establishes that the inadequacy of placement and treatment decisions stems, at least to some extent, from the absence of a uniform policy outlining the criteria for admission and discharge from various levels of mental health care. In this case,
 
 
 56
 [t]he independent experts stated that there is no single official policy that states the criteria for admission to inpatient services in a way that differentiates between the levels of care available. Since there is no written policy, the mental health staff and particularly the psychiatrists are not informed about the policy, and their decision making practices do not appear to be consistent ...."
 
 
 57
 J.A. 657. Accordingly, the independent experts recommended changes, including the "adoption of a uniform policy for admission to the various levels of mental health care, accompanied by ... case finding, tracking, and quality assurance processes to assure implementation of the policy." J.A. 658.
 
 
 58
 Third, defendants argue that the district court improperly modified the consent decree when it ordered inpatient diagnostic evaluations for all inmates admitted to a residential (RTP) treatment unit who are discharged from an acute care facility. Again, there is evidence in the record showing that defendants underutilized comprehensive care units and misplaced inmates in lower levels of mental health care than they should have received.[4]
 
 
 59
 In their report, the independent experts identified "a need to expand CCU capacity." J.A. 652. They also identified "a practice pattern during 1992, 1993, and 1994 thus far, wherein prisoners from SPSM are infrequently if ever committed to this level of care [comprehensive care] in the mental health delivery system." J.A. 652. The independent experts included tables of data in their report which supported their conclusions. J.A. 653.
 
 
 60
 Moreover, Dr. Fischre testified that the independent experts comments concerning the disparity of discharges to CCUs "was fairly supported." J.A. 1191. Dr. Fischre also stated that "from the Jackson Complex situation [SPSM] ... there was a hesitancy on the part of many of the commissions there to refer out of that system." J.A. 1192. Furthermore, the independent experts report also documents that defendants have, on occasion, placed mentally ill inmates at lower levels of care than they should have been. J.A. 657.
 
 
 61
 Finally, in their brief defendants assert that the diagnostic evaluations ordered by the district court are a waste of resources because they take three days, that is 72 hours, to perform. Nevertheless, in their emergency motion for a stay pending appeal, which was filed with this court on March 16, 1995, defendants stated that they had performed 12 diagnostic evaluations since the order of September 1994. Thus, contrary to defendants' assertions, the court-ordered diagnostic evaluations have not been an onerous burden.
 
 B.
 
 62
 Defendants further argue that the district court lacked the authority to order remedial measures because: (1) the United States did not allege that they were in noncompliance with the consent decree or request relief for such noncompliance, (2) the relief ordered by the district court is overly intrusive and contrary to the principles of federalism, and (3) the district court made no finding that any alleged noncompliance by defendants constituted a constitutional violation. Specifically, defendants assert that the district court's remedial order "is overly intrusive and interferes with Michigan's operation and administration of its correctional system." Appellants' Brief at 45. Defendants cite Kendrick v. Bland, 740 F.2d 432 (6th Cir. 1984), asserting that in ordering remedial measures, the district court failed to "'fashion the least intrusive remedy that will still be effective.""' Id. at 437 (quoting parenthetically Newman v. State of Alabama, 559 F.2d 283, 287 (5th Cir. 1977), cert. denied, 438 U.S. 915 (1978)).
 
 
 63
 First, contrary to defendants' claim, the United States need not cite them for noncompliance with the consent decree and request relief in order for the district court to have the necessary authority to order remedial measures pursuant to a consent decree which has been entered after judicial approval. "[B]ecause a district court has a significant administrative interest in securing compliance with its orders, it 'may take such [remedial] steps as are appropriate given the resistance of the noncompliant party."' E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural and Ornamental Ironworkers, 925 F.2d 588, 592 (2d Cir. 1991) (quoting Berger, 771 F.2d at 1569). "[T]hough a court cannot randomly expand or contract the terms agreed upon in a consent decree, judicial discretion in flexing its supervisory and enforcement muscles is broad." Id. at 593. Moreover, in their brief on appeal defendants cite no case law which suggests that a district court lacks authority to enforce a consent decree merely because relief for noncompliance has not been requested.
 
 
 64
 Furthermore, the United States did allege a violation of the consent decree and specifically requested relief from the district court. In its post-trial brief, filed after the April 1994 evidentiary hearing, the United States outlined the evidence of noncompliance which was presented at the hearing, J.A. 672, and requested that the court order defendants "to develop ... the information management system to have the capability of reflecting actual current mental health needs"; to "enter information regarding inmates with mental illness onto the information system at the Reception and Guidance Center, rather than the receiving institution"; and to clearly articulate a policy for "[t]he criteria for admission and discharge for each part of the mental health continuum" and to train clinicians "in the appropriate application of the criteria," J.A. 673-74.
 
 
 65
 Second, the district court's orders are not overly intrusive. The relief ordered by the district court simply requires defendants to implement procedures which the evidence adduced at the April 1994 evidentiary hearing shows are necessary to ensure their compliance with the consent decree and to enable them to provide care for mentally ill inmates, care which they are constitutionally obligated to give.
 
 
 66
 Third, we need not address defendant's claim that the district court must find a constitutional violation before it orders relief. In its opinion of September 6, 1994, the district court found that "[t]he record of the [April 1994] hearing, along with the supplemental record, make it absolutely clear to the Court that SPSM prisoners do not receive appropriate access to CCU care." J.A. 691. The district court further found that "the problem of access to mental health care extends beyond prisoners in special populations, such as those housed in administrative segregation or discharges from acute care. The problem extends to prisoners in the general population who have serious mental illness." J.A. 694-95. Accordingly, the district court stated that it was "persuaded that there are substantial numbers of seriously mentally ill prisoners who are not receiving the level of care warranted or not receiving care at all." J.A. 695. We note that the denial of care to prisoners with serious mental illness can rise to the level of a constitutional violation. See, e.g., Estelle v. Gamble, 429 U.S. 97, 103 (1976).
 
 
 67
 Moreover, the Supreme Court has rejected the notion that a court may enforce a consent decree only to the point of ordering relief to which the parties would have been entitled to after a trial on the merits. See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 522-23 (1986) (stating that because "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree," the statutory limitations which restrict a district court's power to award relief or "impose obligations" after trial "simply do not apply when the obligations are created by a consent decree"). Further, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." Rufo, 502 U.S. at 391. This is so because "state and local officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation." Id. at 392.
 
 
 68
 In this case, defendants cannot insist on the constitutional minimum after deciding to enter into the consent decree and waive the right to establish what remedial measures were constitutionally necessary through litigation. Having entered into a consent decree which obligates them to provide inmates suffering from serious mental illness with adequate care, including "care of serious mental illness which meet[s] contemporary professional standards," J.A. 276, "suitable separated housing adequate to house every inmate who exhibits a serious threat of suicide or who attempts suicide," J.A. 277, "inpatient services for serious mental illness," id., and "staffing for outpatient services ... and inpatient services ... available to each inmate" which "shall meet contemporary professional mental health standards to provide necessary outpatient psychiatric and psychological care for seriously mental ill inmates," J.A. 278, defendants cannot now insist that the district court find that conditions at the institutions covered by the consent decree have fallen below the relevant constitutional standards before it orders them to comply with the requirements of the consent decree.
 
 
 69
 Finally, contrary to defendants' assertions, the decisions in Lelsz v. Kavanagh, 807 F.2d 1243 (5th Cir.), cert. dismissed, 483 U.S. 1057 (1987), and Kendrick v. Bland, 740 F.2d 432 (6th Cir. 1984), do not mandate reversal of the remedial measures ordered by the district court. In Lelsz, the Fifth Circuit held, in part, that pursuant to the decision of the Supreme Court in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984) (Pennhurst II), the district court lacked subject matter jurisdiction to enforce a consent decree requiring state officials to comply with their obligations under state law. The Fifth Circuit stated that the decision in "Pennhurst II ... would prevent a federal court from exercising remedial authority in any form if the award of such relief against a nonconsenting state is based on a state law claim." Lelsz, 807 F.2d at 1252. Here, defendants' obligations do not originate with state law, and the remedial measures ordered by the district court are encompassed by the consent decree and accompanying state plan, to which the state officials consented.
 
 
 70
 Furthermore, in Kendrick we held that the district court exceeded its authority and breached the principles of federalism when it enjoined three prison officials, who had engaged in unconstitutional conduct, from performing certain responsibilities of employment delegated by the state because the relief ordered was not the least intrusive remedy available. Nevertheless, we also stated that "the parties, under the astute guidance of the district court, exhibited a commendable spirit of cooperation designed to rectify the practices, policies, and conditions" which were "constitutionally infirm." Kendrick, 740 F.2d at 434. Nevertheless, while we reasoned that "the least intrusive remedy is particularly compelling ... since the defendants have exhibited a history of cooperation and good faith," we also warned that "'the scope of a district court's equitable power to remedy past wrongs is broad."' Id. at 439 (quoting Hutto v. Finney, 437 U.S. 678, 688 n.9 (1979)). We further stated parenthetically that "'the remedy should begin with what is absolutely necessary. If those measures later prove ineffective, more stringent ones should be considered." Id. (quoting Ruiz v. Estelle, 679 F.2d 1115, 1145-46 (5th Cir. 1982), vacated in part on other grounds, 688 F.2d 266 (5th Cir. 1982), cert. denied, 460 U.S. 1042 (1983)).
 
 
 71
 In its opinion of September 6, 1994, the district court noted that it had "found defendants in contempt of court" with respect to an earlier version of the state plan, "but relieved the state of contempt." J.A. 680-81. The district court further noted that "[o]n October 15, 1990, ... [it] found defendants in contempt of the Correctional Mental Health Facility Development Schedule ordered originally on September 24, 1988," and had ordered "[a] schedule of fines." J.A. 682. Finally, the district court found that "[a]lthough defendants, at the April 28, 1994 hearing, argued that they were fully compliant with all requirements pertaining to mental health care, ... the evidence demonstrates otherwise." J.A. 684.
 
 
 72
 In this case, defendants have not exhibited the commendable history of cooperation and good faith present in Kendrick. Accordingly, the district court did not abuse its discretion when it ordered remedial measures designed to ensure compliance with the consent decree, even assuming arguendo that those remedial measures were not the least intrusive available but were somewhat more stringent.
 
 C.
 
 73
 Defendants argue that the district court lacked jurisdiction to enter the February 1995 orders because they modified the September 1994 orders of the district court after defendants had appealed those orders to this court. More specifically, defendants assert that the district court's February 1995 orders altered: (1) "the number [and specific types] of beds [they were] ordered to staff and operate by April 30, 1995," at the new Huron Valley facility; and (2) "the number of residential treatment beds mandated to be opened by December 31, 1995." Supplemental Appellants' Brief at 4.
 
 
 74
 (1)
 
 
 75
 "As a general rule, an effective notice of appeal divests the district court of jurisdiction over the matter forming the basis for the appeal." N.L.R.B. v. Cincinnati Bronze, Inc., 829 F.2d 585, 588 (6th Cir. 1987). "'[T]he mere pendency of an appeal does not, in itself, disturb the finality of a judgment."' Id. (quoting Wedbush, Noble, Cooke, Inc. v. SEC, 714 F.2d 923, 924 (9th Cir. 1983)). A "'district court has jurisdiction to act to enforce its judgment so long as the judgment has not been stayed or superseded."' Id. (quoting Nicol v. Gulf Fleet Supply Vessels, Inc., 743 F.2d 298, 299 n.2 (5th Cir. 1984)). "Although a district court may not alter or enlarge the scope of its judgment pending appeal, it does retain jurisdiction to enforce the judgment." Id. "'[W]here the district court ... has a continuing duty to maintain a status quo, and where, as the days pass, new facts are created by the parties and the maintenance of the status quo requires new action, ... an appeal from the supervisory order does not divest the court of jurisdiction ...."' Island Creek Coal Sales Co. v. City of Gainesville, 764 F.2d 437, 439-40 (6th Cir.), cert. denied, 474 U.S. 948 (1985) (quoting Hoffman v. Beer Drivers & Salesmen's Local Union No. 888, 536 F.2d 1268, 1276 (9th Cir. 1976)).
 
 
 76
 (2)
 
 
 77
 Defendants' claim concerning the opening of certain beds at the Huron Valley Center by April 30, 1995, is moot. Defendants argue that the district court's February 1995 orders, which require them to open certain mental health beds at the Huron Valley Center by April 30, 1995, is an improper modification of the district court's September 1994 orders. However, on April 7, 1995, we issued an order staying that portion of the district court's order which required Michigan to open a certain number of mental health beds by April 30, 1995, and extending the April 30, 1995 deadline until December 30, 1995. Further, in a letter dated May 22, 1995, counsel for defendants stated that the required number of beds would be opened by June 5, 1995. Accordingly, defendants' claim that the district court improperly ordered them to open certain mental health beds by April 30, 1995, is moot.
 
 D.
 
 78
 Defendants argue that the district court's February 22, 1995 orders, which require them to open 400 beds at the new Huron Valley Center by December 31, 1995, changes the September 1994 orders. Defendants assert that (1) "[t]he September 1994 order did not mandate a specific number and type of beds to be operated by Michigan at the new facility," Supplemental Appellants' Brief at 5, and (2) they previously informed the court in the December 1991 Operational Transition Plan that the new facility "was being built for a future capacity of 400 beds, not necessarily that all 400 beds were to be operated and staffed," Supplemental Appellants' Brief at 7.
 
 
 79
 However, the district court's September 6, 1994 order clearly requires defendants to provide 400 beds at the new Huron Valley Center, including acute and comprehensive beds relocated from the Riverside facility, and also requires defendants to provide "all capacity related to the April 15 [1993] [p]lan ..., including the relocation of the CCU at Riverside Psychiatric Center to the Huron Valley Mental Health Facility." J.A. 712. The April 15, 1993 plan, which was drafted by defendants, provides for the "[o]pening of 400 new beds at the correctional mental health facility currently under construction on the site of the former Huron Valley Women's Facility." J.A. 512. The April 1993 plan also explains that the 400 beds at the new Huron Valley facility will include acute and CCU beds transferred from the Riverside facility and details both the time-frame and procedures for the relation of the beds. J.A. 512-13.
 
 
 80
 Furthermore, defendants' assertion is totally inconsistent with the representations they have previously made to the district court and this court. In their brief in support of their motion for an extension of time to comply with the district court's order of September 6, 1994, defendants acknowledged that the September 6, 1994 order required them to "'implement the treatment capacity identified in [the] April 105 [sic] 1993 [p]lan,"' J.A. 772, which included 400 "[a]cute and chronic care beds at the new [Huron Valley] facility," J.A. 773. Furthermore, in their brief on appeal, defendants admit that "[t]he September 6, 1994 order required Michigan to staff and operate all 400 beds available at the new mental health facility." Supplemental Appellants' Brief at 18.
 
 
 81
 Thus, the February 1995 orders requiring defendants to open 400 beds, including 100 acute and 204 CCU beds relocated from Riverside, at the new Huron Valley facility do not change the overall number of beds required.[5] Moreover, because the February 1995 orders do not result in a change in the overall number of beds from the September 1994 order, it is not, as defendants contend, overly intrusive.
 
 
 82
 Finally, defendants argue that the district court lacked jurisdiction in its February 1995 orders to reduce the number of residential beds required since they had already filed an appeal concerning the district court's September 1994 orders, which specified the number and types of beds required. See Supplemental Appellants' Brief at 15. We agree. As noted previously, "a district court may not alter or enlarge the scope of its judgment pending appeal ...." Cincinnati Bronze, 829 F.2d at 588. Thus, in this case, since the district court's September 1994 orders were already on appeal, the district court lacked jurisdiction in February 1995 to reduce the number of mental health beds which it had required defendants to provide in its September 1994 orders.
 
 III.
 
 83
 For the reasons stated, the district court's September 1994 orders are AFFIRMED. Further, defendants challenge to the requirement in the district court's orders of February 1995 requiring the opening of certain beds at the Huron Valley facility is DISMISSED as moot, the portion of the district court's February 1995 orders requiring the opening of 400 mental health beds at the Huron Valley facility by December 31, 1995, is AFFIRMED, and that portion of the district court's February 1995 orders reducing the number of residential beds defendants were required to open is REVERSED because the district court lacked jurisdiction to modify its orders of September 1994 while those orders were on appeal to this court.
 
 
 
 *
 Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 This case has previously been appealed several times to the Sixth Circuit. The relevant background facts to this case are aptly summarized in this court's prior opinion in United States v. Michigan, 940 F.2d 143 (6th Cir. 1991), and in the opinion in United States v. Michigan, 18 F.3d 348 (6th Cir.), cert. denied, 115 S. Ct. 312 (1994), and will not be repeated here. Instead, we set forth only the facts which we deem necessary to our decision
 
 
 [2]
 DESS is a computer simulation program
 
 
 [3]
 Defendants argue, relying on this court's decision in United States v. Michigan, 940 F.2d 143 (6th Cir. 1991), that we should review the district court's denial of their motion to modify the consent decree under a de novo standard, rather than under an abuse of discretion standard. In Michigan, we held that where a party appeals from orders which are modifications of the consent decree and which are injunctive in nature, "an assessment of the afforded injunctive relief will, of necessity, require plenary review of the entire record." 940 F.2d at 152. Only the third of the district court's actions, namely, requiring the State to develop a utilization database, is in the nature of injunctive relief. Thus, we shall review that portion of the district court's orders under a de novo standard. However, we shall review the district court's denial of defendants' motion to modify the consent decree under an abuse of discretion standard. Further, we note that even if we were to review the district court's denial of the motion to modify the consent decree under a de novo standard, rather than an abuse of discretion standard, we would reach the same result
 
 
 [4]
 Moreover, it should be noted that the district court's order concerning diagnostic evaluations was to be reconsidered in June 1995. Specifically, the district court ordered the parties to "report to the Court by June 1, 1995, on whether th[e] [diagnostic evaluation] requirement should be continued, modified, or vacated." J.A. 725
 
 
 [5]
 The only difference between the February 1995 order and the April 1993 plan is that the February 1995 order requires 400 beds at the Huron Valley facility, including 204 CCU beds relocated from Riverside, while the April 1993 plan provides for 400 beds including 200 CCU beds. This difference is so minor as to be insignificant